# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

JAMAL DAMON HENDRIX,

    Plaintiff

v.

M. SHARP, et. al.,

    Defendants

Case No.: 3:18-cv-00084-RCJ-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 43

This Report and Recommendation is made to the Honorable Robert C. Jones, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 43, 43-1 to 43-15.) Plaintiff filed a response. (ECF Nos. 50, 50-1.) Defendants filed a reply. (ECF No. 53.)

After a thorough review, it is recommended that Defendants' motion be granted.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 5.) The events giving rise to this action took place while Plaintiff was housed at Ely State Prison (ESP). (*Id.*)

Plaintiff was allowed to proceed with claims against the following Defendants: Alejandro Arias-Flores, Christopher Ashdown, Elliot Burleigh, Mike Byrne, Kelvin Chung, Corey Cooke, Christopher Davis, George Davis, Daniel Esquivel, Carlos Gomez, Christopher Hayman, Leslie

Healer, Patricia Hernandez, Taylor Ingle, Jacob Parr, Tasheena Sandoval, Michael Sharp, and a John Doe defendant (once Plaintiff identified the Doe).

Taylor Ingle was subsequently dismissed. (ECF No. 37.) District Judge Jones issued an order notifying Plaintiff of his intent to dismiss Healer and Gomez for lack of service under Federal Rule of Civil Procedure 4(m). To date, Healer and Gomez have not been served; therefore, they should be dismissed without prejudice under Rule 4(m). In addition, Plaintiff never moved to substitute in a defendant for the Doe defendant; therefore, the Doe defendant should also be dismissed without prejudice.

On screening, Plaintiff was allowed to proceed with the following claims: (1) a retaliation claim in Count I against Hernandez, Sandoval, C. Davis, Hayman, Cooke, Byrne (and Healer), based on allegations that they put him in a cell with a dangerous inmate because Plaintiff had reported Defendants to a Deputy Attorney General for not cooperating with his discovery request; (2) a retaliation claim in Count II against Ashdown, Chung, Arias-Flores, Burleigh (and Ingle and Doe) based on allegations they denied or delayed serving his meals sometimes five to six hours after sunset during Ramadan because Plaintiff had filed grievances and lawsuits; (3) a Free Exercise Clause claim in Count II against Ashdown, Chung, Arias-Flores, Burleigh (and Ingle and Doe) based on allegations that when they denied or delayed his Ramadan meals he was forced to miss prayer because his religion requires that he eat before attending prayer; (4) a retaliation claim in Count III against John Doe based on the allegation that Doe put a rock in Plaintiff's meal because Plaintiff had filed a grievance about his Ramadan meals; (5) a retaliation claim in Count IV against Sharp, Parr and G. Davis based on allegations that they unnecessarily ordered Nurse Roger (who is not a defendant) to not give Plaintiff his epileptic seizure medication because Plaintiff had filed a complaint under the Prison Rape Elimination Act

(PREA); (6) an Eighth Amendment conditions of confinement claim in Count V against Sharp, Esquivel, Gomez and Hayman based on allegations that they knew the cell they put Plaintiff in for 48 hours had no running water except for out of the toilet. (ECF No. 8.)

Defendants move for summary judgment, arguing: (1) Plaintiff's retaliation claim in Count I fails because Plaintiff's was moved to the infirmary because he refused to double-cell; (2) the retaliation and Free Exercise Clause claims in Count II fail because Plaintiff cannot establish his meals during Ramadan were delayed or not delivered and there was no substantial burden on his religion; (3) Count III fails because Plaintiff has not identified the Doe defendant; (4) Count IV fails because the delay in receiving his medication was because Plaintiff was urinating through his cell door; (5) Count V fails because Plaintiff failed to exhaust his administrative remedies; and (6) alternatively, Defendants are entitled to qualified immunity. (ECF No. 43.)

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id*. at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

1    "The purpose of summary judgment is to avoid unnecessary trials when there is no

2    dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

3    F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

4    of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

5    U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

6    one party must prevail as a matter of law"). In considering a motion for summary judgment, all

7    reasonable inferences are drawn in the light most favorable to the non-moving party. *In re*

8    *Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

9    *& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

10    nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

11    477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

12    determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

13    *Anderson*, 477 U.S. at 249.

14    In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

15    "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

16    come forward with evidence which would entitle it to a directed verdict if the evidence went

17    uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

18    the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

19    *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

20    omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

21    defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

22    an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

23

party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Count I**

Plaintiff alleges that on February 15, 2017, Hernandez, Sandoval, Davis, Hayman, Cooke, Byrne (and Healer) tried to force Plaintiff to double cell with a known gang member because Plaintiff had reported the to a Deputy Attorney General (DAG) that Defendants were not cooperating with his discovery request. He alleges that they knew Plaintiff does not double cell with gang members because he is a Sunni Muslim. He avers that he asked Hernandez, who was his caseworker, to cell him with only Muslims. Plaintiff claims that when he refused to cell with a known gang member, Defendants ordered Plaintiff removed from his cell and placed in the infirmary.

1    "Section 1983 provides a cause of action for prison inmates whose constitutionally

2    protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791

3    F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a

4    claim consists of the following elements: "(1) An assertion that a state actor took some adverse

5    action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action

6    (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not

7    reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v.*

8    *Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

9    "The First Amendment guarantees a prisoner a right to seek redress of grievances from

10   prison authorities as well as a right of meaningful access to the courts." *Id.* (citing *Bradley v.*

11   *Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

12   According to Defendants, in January of 2017, Plaintiff was in administrative segregation

13   due to an investigation regarding a pending notice of charges. (ECF No. 43-2 at 11, 1/25/17

14   entry). On February 15, 2017, he was housed in the infirmary because he continuously refused to

15   be double celled. (ECF No. 43-3 at 3) Thirty days later, Plaintiff was reminded he could move to

16   general population if he would double cell, as required by Operating Procedure (OP) 503.2.

17   (ECF No. 43-4[1]; ECF No. 43-5 at 2) Plaintiff refused and said he would not double cell with

18   anybody the officer put him with, and would only agree to double cell with inmates he approved.

19   (ECF No. 43-5 at 2.) The officer asked Plaintiff if he had any names of potential cellmates, and

20   he refused to provide any names. The officer offered Plaintiff an appropriate cellmate, and he

21   again refused. (*Id.*)

22

23   [1] OP 503.2.7 states that due to limited availability of single cells, inmates will only be eligible for
     singles cells if they have medical or psychological needs or for the safety and security of the
     institution. (ECF No. 43-4 at 7.)

Plaintiff submitted an informal level grievance on March 19, 2017, stating that inmates are housed in the infirmary whenever double celling has been refused and they are awaiting bed space in the administrative segregation unit. (ECF No. 43-6 at 2, 4-5.) NDOC explained to Plaintiff he was being housed in the infirmary because of his continual refusal to be double celled and there was no available bed to put him in. (*Id.* at 3.)  Plaintiff still refused to double cell, and this resulted in a write-up and disciplinary action. Plaintiff was found guilty and was sanctioned with disciplinary segregation. (ECF No. 43-7.)

Plaintiff filed another grievance claiming that Sandoval and Hernandez (and Healer) retaliated against him by forcing him to double cell with an "STG" (security threat group) prison inmate so that Plaintiff would be injured. (ECF No. 43-8 at 6.) In response to another grievance, Plaintiff was told that his move to the infirmary was due to his refusal to double cell, and confirmed he was not in the same tier group as a known enemy. (ECF No. 43-8 at 6.)

Defendants argue that Plaintiff was never celled with a gang member, and his cell assignment was solely the result of his refusal to double cell. Defendants contend that Plaintiff was not placed in a cell with an alleged gang member, but was placed in the infirmary. His bed history, summary of discipline and informal grievance all confirm he was not housed with a dangerous inmate. His informal grievance makes no mention of a discovery dispute or a report to a DAG.  Instead of suggesting an appropriate prospective cellmate to NDOC employees, he refused to discuss double celling, and took discipline instead.

In his declaration, Plaintiff states that on December 5, 2016, and January 3, 2017, he notified DAG Erin Albright that he was not getting cooperation with his discovery, such as being able to review his I-file through Hernandez. (Pl. Decl., ECF No. 50 at 61 ¶ 4.)

On January 15, 2017, Plaintiff states that he was double celled with an inmate from housing Unit 2A. (*Id.* ¶ 6.) Between January 15 and February 15, 2017, Plaintiff told Hernandez that he would not double cell with gang members, but would only double cell with Sunni Muslims. Hernandez agreed to locate a Sunni Muslim for Plaintiff to double cell with. (*Id.* at 62 ¶ 7.) On February 15, 2017, Hernandez returned with Davis, Sandoval, Hayman, Byrne and Cooke to remove Plaintiff from his cell and place him in the infirmary without his property. (*Id.* ¶ 5, 62 ¶ 9.) Plaintiff states that he was asked to double cell in the same group as his enemy in retaliation for notifying DAG Albright about the discovery issue. (*Id.* at 62 ¶ 10.) He submits a document indicating that he did have a telephone conference scheduled with Ms. Albright on February 15, 2017, at 9:00 a.m. (ECF No. 50 at 29.)

Plaintiff provides the interrogatory responses of C. Davis, who says that he did not order Plaintiff's removal from the cell, and it was Plaintiff who requested to see a sergeant or lieutenant and said he could not live (or refused to cell with) another inmate. C. Davis indicated that Plaintiff was moved from the unit to the infirmary due to his refusal to double cell, the availability of empty cells and the safety/security needs of the institution at that time. (ECF No. 50-1 at 35, response to interrogatory 6.) C. Davis also stated that the infirmary is not used for punishment. Plaintiff refused to live in a cell with another inmate so to accommodate this, he was moved to an empty custody cell and placed on temporary administrative segregation for 72 hours until he could be seen and reclassified by a caseworker. (ECF No. 50-1 at 36, response to interrogatory 9.)

Plaintiff also submits the interrogatory responses of Sandoval, who states that inmates are required to double cell, and if they cannot, that bed may be needed for inmates that are willing to

double cell. (ECF No. 50-1 at 44, response to interrogatory 4.) Sandoval also states that she does not know the exact reasons that Plaintiff was moved to the infirmary on February 15, 2017. (ECF No. 50-1 at 45, response to interrogatory 6.) Sandoval explains that inmates generally speak to other inmates to find an appropriate cellmate, and if they cannot find one on their own, the caseworker will assign a cellmate that appears to be appropriate on the information available. (ECF No. 50-1 at 45, response to interrogatory 8.) Plaintiff asked Sandoval why he was asked to double cell with a known gang member by Hernandez, and Sandoval responded that she did not know who Plaintiff was asked to live with. (ECF No. 50-1 at 46, response to interrogatory 9.)

Plaintiff also provides his inmate grievance history reflecting that he filed a grievance on this issue, and in response he was told that Hernandez said Plaintiff was provided several opportunities to submit the name of someone Plaintiff would be comfortable celling with, and Plaintiff failed to do so. Hernandez confirmed that at no time would Plaintiff be housed in the same tier group as any known enemy. In addition, Plaintiff was moved from Unit 6 to the infirmary based on the fact that he refused to double cell with anyone unless his criteria was met. (ECF No. 59-1 at 89.)

In their reply, Defendants assert that Plaintiff claims he was housed with a dangerous inmate, but between January 15 and February 15, 2017, he was still in administrative segregation and then was moved to the infirmary when he refused to double cell.

Plaintiff's pleading alleges the adverse action was housing him in a cell with a dangerous inmate. Defendants have submitted evidence that Plaintiff was moved to the infirmary on February 15, 2017, because he had refused to be double celled. While Plaintiff claims that he was housed with a dangerous inmate, the records are clear that he was moved to the infirmary on

1  February 15, 2017, and Plaintiff has provided no evidence that he was in fact placed in a cell

2  with a dangerous inmate.

3       Moreover, an inmate must submit evidence to establish a link between the exercise of

4  constitutional rights and the retaliatory action. *Pratt*, 65 F.3d at 806-07. The plaintiff "must show

5  that his protected conduct was the 'substantial' or 'motivating' factor behind the defendant's

6  conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 20090 (citation and quotation marks

7  omitted). A plaintiff's mere speculation that there is a causal connection is not enough to raise a

8  genuine dispute of material fact. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citations

9  omitted) (affirming grant of summary judgment where there was no evidence that defendants

10  knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in

11  reference to the prior lawsuit); *see also Nelson v. Pima Comm. College*, 83 F.3d 1075, 1081-82

12  (9th Cir. 1996) (citation omitted) ("mere allegation and speculation do not create a factual

13  dispute for purposes of summary judgment").

14       There is no evidence of a causal connection between Plaintiff's move to the infirmary and

15  his telephone conference with DAG Albright. Plaintiff says that he raised Hernandez's failure to

16  let him review his I-file in the telephone conference with DAG Albright, but he presents no

17  evidence that he advised Hernandez, or any of the other Defendants named in this claim, of the

18  substance of his conversation with DAG Albright such that it could be seen as a "substantial" or

19  "motivating" factor behind the bed move.

20       In the absence of evidence of a causal connection between the alleged adverse action and

21  protected conduct, summary judgment should be granted in Defendants' favor on the retaliation

22  claim in Count I.

23

**B. Count II**

Plaintiff alleges that on May 26, 2017, Plaintiff began observing the holy month of Ramadan as a practicing Sunni Muslim. He contends that Ashdown, Chung, Arias-Flores, and Burleigh (as well as Ingle and Doe) sometimes failed to provide, or delayed providing, his meals to break his fast after sunset, and sometimes the meals were as late as five to six hours after sundown. He avers that this forced him to sometimes miss prayer because under Islamic law he must eat before prayer. Plaintiff claims that Defendants did this because of Plaintiff's grievances and ongoing lawsuits against their subordinates. He was allowed to proceed with a retaliation claim as well as a Free Exercise Clause claim based on these allegations.

Defendants acknowledge that Plaintiff began observing Ramadan on May 26, 2017, which ran through June 24, 2017. During that time, the sunset in Ely, Nevada was at approximately 8:00 p.m. (Citing https://sunrise-sunset.org/us/ely-nv/2017/6, and requesting the court take judicial notice of the sunset times under Federal Rule of Evidence 201.)[2]

Food service is governed by OPs 269 and 269.4 (ECF Nos. 43-9, 43-10) These OPs also cover religious meals. In addition, food service during Ramadan is completed pursuant to a schedule. The food service memorandum states that for dinner, inmates observing Ramadan would be served a sack meal. Meals were to be picked up at 7:00 p.m. and delivered to the units, and the unit officers were to distribute the meals no later than 7:30 p.m. to the inmates. (ECF No. 43-15.)

---

[2] The court may take judicial notice of a fact that is not subject to reasonable dispute that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). Here, it is appropriate to take judicial notice of the time of the sunset in Ely, Nevada during the applicable time period based on the information provided by Defendants.

Plaintiff submitted a grievance on this issue. He submitted his informal level grievance on June 2, 2017, and stated that during Ramadan the evening meals are to be eaten at sundown and prayers cannot be offered until the fast is broken. He claimed that his evening Ramadan meals were delayed by Ashdown, Chung, Burleigh, Arias (and Ingle). He asserted that Ashdown was retaliating against him for reporting on his coworkers for depriving him of a food tray. (ECF No. 43-11 at 6, 8-10.) The informal level grievance was denied, stating that there was no evidence to substantiate his allegations that Ramadan meals were delayed, and that culinary and unit staff were delivering meals in accordance with operational procedures. (ECF No. 43-11 at 7.)

In the first level grievance, Plaintiff claimed the Ramadan trays were delayed on purpose, and this hindered his prayer because he needed the food before prayer time. (ECF No. 43-11 at 4.) The first level grievance was denied, stating that culinary and unit staff indicated that Ramadan meals were delivered in accordance with operational procedures and there is no evidence to substantiate the claims. (ECF No. 43-11 at 5.)

His second level grievance is dated September 4, 2017, and Plaintiff stated that his Ramadan food trays were given to him late on purpose and this would occur when he moved forward on a grievance or write up about the officer's conduct. (ECF No. 43-11 at 2.) The second level grievance was denied, stating that the allegation that the Ramadan food items were delayed was reviewed and found to lack merit. Culinary staff and unit operations staff indicated the food for Ramadan was delivered in accordance with operational procedures, and there was no evidence to substantiate Plaintiff's claims. (ECF No. 43-11 at 3.)

In his declaration, Plaintiff states that on May 26, 2017, and through June 25, 2017, Plaintiff observed the holy month of Ramadan as a practicing Sunni Muslim. (Pl. Decl., ECF No.

12

50 at 65 ¶ 3.) He claims that he was sometimes given his religious meals late after sundown, up to five or six hours late on certain days, and sometimes he would not get the meals at all. (*Id*. at 65-66 ¶ 7.) He states that "S&E" would drop off the Ramadan meals early, but Burleigh, Arias-Flores, Chung, Ashdown (and Ingle) would sit in the control office at their desks and would not give the meals out despite Plaintiff kicking and yelling to ask for the meals. (*Id*. at 66 ¶ 8.)

### 1. Retaliation

Defendants argue that the grievance responses establish that Plaintiff's food delivery complied with applicable operating procedures. In addition, they contend that the allegation of a five to six hour delay is implausible because during Ramadan in Ely, Nevada in 2017, the sunset took place at approximately 8:00 p.m., and so with a five or six hour delay food service would have been at 1:00 or 2:00 a.m. According to the Ramadan schedule, the meals were to be distributed by 7:30 p.m. (ECF No. 43-15.)

Plaintiff argues that this does not mean that Defendants followed the schedule and his evidence is in his grievance and verified amended complaint, and he contends Defendants denied and delayed his Ramadan trays in retaliation for filing grievances and lawsuits against their coworkers and subordinates.

Defendants provide evidence of the schedule for delivering Ramadan meals during the applicable time period, and the denial of Plaintiff's grievance on this issue on the basis that the meals were delivered in accordance with the schedule and NDOC operating procedures. In response, Plaintiff provides no more than his general statement that his meals were sometimes denied or delayed. He does not state which Defendant denied or delayed his meals, or when. Nor does he address Defendants' argument that if the meals were delivered five to six hours late, they would have been delivered between 1:00 a.m. and 2:00 a.m., which seems implausible.

Importantly, Plaintiff provides no substantive factual evidence to demonstrate a causal connection between the alleged adverse action of denying or delaying his Ramadan meals and the protected conduct of filing grievances and litigation. He provides no evidence of what lawsuits or grievances he is referencing. Nor does he provide the court with any facts about how each defendant named in this claim knew about the lawsuit or grievance or when the defendant came to know about the lawsuit or grievance. In other words: Plaintiff's argument is that the meals were denied or delayed because Plaintiff had filed grievances and lawsuits against the Defendants' coworkers and subordinates, but provides no information as to how each Defendant knew about a grievance or lawsuit that was not filed against him/her, but against someone else.

Again, in the absence of evidence of a causal connection between the alleged adverse action and protected conduct, summary judgment should be granted in favor of Defendants on the retaliation claim in Count II.

**2. Free Exercise Clause**

"The First Amendment, applicable to state action by incorporation through the Fourteenth Amendment … prohibits government from making a law prohibiting the free exercise [of religion]." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citations and quotation marks omitted). "The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008).

To implicate the Free Exercise Clause, a prisoner must first establish his belief is both sincerely held and rooted in religion. *See Shakur*, 514 F.3d at 884-85. Then, a person asserting a free exercise claim must show "that the government action in question substantially burdens the person's practice of her religion." *Jones v. Williams*, 791 F.3d 1023, 1032 (9th Cir. 2015) (citation omitted). "A substantial burden … place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id*. (citation and internal quotation marks omitted).

Defendants argue that there was no substantial burden on Plaintiff's ability to pray or otherwise observe his religion. Initially, they argue that this is because Plaintiff was served his meals in accordance with NDOC operating procedures and the Ramadan meal schedule. In addition, they assert that where Muslim inmates have the opportunity to eat prior to sunrise and after sunset, an inmate is not denied his ability to express his religion. In addition, they assert that an isolated or sporadic interference does not substantially burden the free exercise of religion. (Citing *Canell v. Lightner*, 143 F.3d 1210, 1215 (9th Cir. 1998); *Thomas v. Cox*, 3:13-cv-508-RCJ-CBC, 2019 WL 2509023 at *7 (D. Nev. May 3, 2019) (receiving single improper kosher meal during Passover did not constitute a substantial burden).

Plaintiff argues that he was forced to violate religious laws during Ramadan on numerous occasions because of the denial and delay of food trays which he needed to break his fast before prayer. Plaintiff states that it is a violation for an Islamic practitioner to have meals late during Ramadan as the meals prolong the start of the Maghrib prayer. (Pl. Decl., ECF No. 50 at 65 ¶ 5.)

Defendants do not appear to dispute that Plaintiff's belief is both sincerely held and rooted in his Sunni Muslim faith. The question then, is whether Defendants substantially

15

burdened the practice of his religion. In this case, this turns on whether or not he was denied or delayed his meals during Ramadan, such that he was unable to pray because his religion required him to break his fast before engaging in prayer.

Defendants present evidence that Plaintiff was provided his meals in accordance with NDOC operating policies and the Ramadan meal schedule. Plaintiff, on the other hand, responds only with the general assertion that he was "sometimes" denied and delayed his evening meals during Ramadan.

The opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

Plaintiff is required to demonstrate a genuine dispute of material fact as to whether his religious practice was "substantially burdened." Simply repeating the allegation that his Ramadan evening meals were "sometimes" denied or delayed, without providing any factual evidence as to when or how often this occurred, or which Defendant denied or delayed his meals, is insufficient to demonstrate a "substantial burden." *See Far Out Productions, Inc. v. Oskar*, 247 F.3d 986 (9th Cir. 2001) (affidavits that did not present any specific facts to support the claims were insufficient to preclude grant of summary judgment). "The burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." 10A Wright, et. al., *Federal Practice and Procedure* § 2727.2 (4th ed. 2008). Plaintiff presents no specific facts to support his claim that he was denied or delayed his meals during Ramadan. Therefore, he has not raised a genuine dispute of material fact to preclude the entry of summary judgment as to this claim.

Therefore, summary judgment should be granted in Defendants' favor as to the Free Exercise Clause claim in Count II.

**C. Count III**

Plaintiff was allowed to proceed with a retaliation claim against John Doe based on the allegation that Doe put a rock in Plaintiff's meal because Plaintiff filed grievances about his Ramadan meals.

Plaintiff asserts that he was denied the identity of the Doe defendant in discovery; however, Plaintiff had ample time to conduct discovery on this issue, and Plaintiff does not indicate he filed a motion to compel this information.

The court has recommended dismissal of the Doe defendant without prejudice for lack of service; therefore, Count III should be dismissed without prejudice.

**D. Count IV**

Plaintiff alleges that on July 26, 2017, Sharp, Parr and G. Davis retaliated against him when they told Nurse Roger (who is not a defendant) not to give Plaintiff his epileptic seizure medication during the morning medication pass (also referred to as pill call), because Plaintiff had filed a PREA complaint against Sharp.

According to Defendants, NDOC performed a monthly administrative segregation review of Plaintiff on July 26, 2017. (ECF No. 43-2 at 12.) Plaintiff refused to be seen at the door, and due to pending charges for an offense in custody his status in administrative segregation was not changed. Plaintiff then began to urinate out his cell door. (*Id.*).

Plaintiff filed a grievance asserting that NDOC employees withheld medicine without a penological reason. Plaintiff was informed in response to the grievance that the reason he did not receive his medicine was because he had been propelling urine from his cell. The response

confirmed that medical staff returned after his behavioral display had concluded." (ECF No. 43-8 at 3.) In his first level grievance, Plaintiff indicated his disagreement, stating that he did not propel urine from his cell front, but water had spilled from his cup. The first level grievance was also denied. (*Id.*) Plaintiff reiterated his claim that he was denied his seizure medication in his second level grievance. (*Id.*) The second level response states that Parr did not have the authority to deny an inmate medication attention. Instead, the behavioral misconduct made Plaintiff a risk, and after the situation was deescalated Plaintiff was provided with his medication. (*Id.* at 4.)

In addition, Defendants contend that his prison records do not indicate any PREA complaint submitted was prior to July of 2017 to act as a basis for a retaliation claim. (ECF No. 43-2.)

Plaintiff states in his declaration that Nurse Rogers followed the order of Sharp and Parr to not give Plaintiff his seizure medication. (Pl. Decl., ECF No. 50 at 72 ¶ 4.) Plaintiff notified G. Davis who was in the control bubble by using his call button in his cell, but Davis refused to answer. (*Id.* ¶ 5.) Plaintiff says the only disturbance made was him kicking his door to get Davis' attention so he could get his medication before medical staff left the housing unit. (*Id.* ¶ 6.) Plaintiff asserts that Parr and Sharp did not return to Plaintiff with the medical staff to hand Plaintiff his seizure medication. He also disputes that there were correctional staff in the unit to observe any supposed bad behavior by Plaintiff. (*Id.* ¶ 7.) Plaintiff states that he did not propel urine through his cell door. (*Id.* at 73 ¶ 9.) Instead, he says that he had a cup of water sitting by the door for when the nurse brought his medication, and when he went to the door, he accidentally kicked the cup of water and it spilled and some of it went out on to the tier in front of his cell. (Id. at 75 ¶ 19.) He says that even if he had been propelling urine out of his door, they could have given him his medication through the slot in the door and using a plastic shield. (*Id.*

at 73 ¶¶ 10-11.) Plaintiff also points out he did not receive a misbehavior report for propelling urine. (*Id*. at 74 ¶ 13.) Plaintiff maintains that Sharp and Parr retaliated by denying Plaintiff his medication because just days prior Plaintiff filed a PREA complaint verbally by telephone against Sharp after Sharp told Plaintiff to "suck his penis." (*Id*. ¶ 18.)

Plaintiff includes Sharp's response to interrogatories, and Sharp says that an inmate may be refused medication for safety and security concerns, and it may be necessary to give the inmate another try when the situation has deescalated. (ECF No. 50 at 94, response to interrogatory 4.) Sharp also says that protective shields are designated for "high risk inmates" or inmates with a known issue for propelling staff, and unless those circumstances are present the shield will not be used unless there is an emergency. (*Id*. at 94-95, response to interrogatory 5.) Sharp was asked if he told the nurse not to give Plaintiff his seizure medication on July 26, 2017. Sharp responded that he did not recall this particular incident, but the only reason an inmate would be refused anything would be due to safety and security concerns. (ECF No. 50 at 95-96, response to interrogatory 7.)

Plaintiff also provides his grievance on this issue, where he claimed this was done on purpose in response to Plaintiff sending a PREA complaint to the Inspector General's Office. (ECF No. 50-1 at 5.) In the first level grievance, Plaintiff also asserted his claim that he did not propel urine, but water spilled from his cup that he had kicked over. (*Id*. at 8.)

In his responses to Plaintiff's interrogatories, Parr says he never had to withhold medication from an inmate. (ECF No. 50-1 at 18, response to interrogatory 5.) In addition, Parr maintains that he would not tell a medical provider not to provide seizure medication to an inmate. (*Id*. at 19, response to interrogatory 6.)

1       According to G. Davis, an inmate would not receive their medication only if the inmate

2 did not comply with orders during the passing out of medication or if the inmate posed a safety

3 and security threat to staff or themselves. (ECF No. 50-1 at 25, response to interrogatory 5.)

4 G. Davis says that if an inmate pushed the call button and told the officer he did not receive his

5 medication, if medical staff were still present he would ask why the inmate did not receive his

6 medication, and if medical staff had left he would call medical and forward the inmate's concern.

7 (*Id*. at 26, response to interrogatory 6.)

8       Plaintiff also provides Operational Procedure 608 which governs pill call procedures and

9 provides that for "HRP" (high risk potential) inmates, staff are required to use the shield every

10 time the food slot is opened. (ECF No. 50-1 at 94.)

11       Defendants present evidence that Plaintiff was not given his medication initially because

12 he was engaging in misbehavior by propelling urine out of his cell door, but was given his

13 medication later when the situation deescalated. Plaintiff disputes that he was propelling urine

14 out his door, and instead maintains he accidentally kicked over the cup of water he had by the

15 door to take his medicine. Plaintiff does not dispute the statement in the grievance response that

16 Plaintiff received his medication once the situation deescalated.

17       Like his other retaliation claims, the court's analysis will focus on the causal connection

18 between the alleged adverse action and protected conduct. Plaintiff claims that Defendants did

19 not give him his seizure medication because he had filed a PREA complaint against Sharp days

20 before. Defendants present evidence that there is no record in Plaintiff's offender information

21 summary of his having filed a PREA complaint before not being given his medication. Plaintiff

22 states in his declaration that he made the complaint on the telephone; however, he provides no

23 other details regarding who he made the complaint to or when exactly it was made. His statement

that he made the complaint verbally over the telephone also contradicts the statement in his

grievance that he had "sent" a PREA complaint to the Inspector General's Office.

The court does not condone the statement Plaintiff attributes to Sharp, if it was in fact

made, and if it was, such as statement might be appropriately raised in a PREA complaint. That

being said, for an inmate to sustain a retaliation claim against a prison official, he must present

evidence that the prison official's adverse action was motivated by the inmate's protected

conduct. Here, Plaintiff provides no evidence that Sharp, Parr or Davis knew about the PREA

complaint, and there is no record of such a complaint being made in Plaintiff's prison file. In

addition, Plaintiff does not address whether Parr or Davis even knew about Sharp's alleged

statement that Plaintiff purports gave rise to the PREA complaint.

In sum, the court finds that Plaintiff failed to produce sufficient evidence to create a

genuine dispute of material fact as to whether Plaintiff not getting his seizure medication initially

was motivated by Plaintiff filing a PREA complaint against Sharp. Therefore, summary

judgment should be granted in Defendants' favor as to the retaliation claim in Count IV.

**E. Count V**

Plaintiff alleges an Eighth Amendment conditions of confinement claim against Sharp,

Esquivel, Hayman and Gomez, based on his assertion that he had to take his medication with

toilet water because the sink was without running water for 48 hours.[3]

Defendants argue that Plaintiff failed to exhaust his administrative remedies as to this

claim.

---

[3] Plaintiff's response mentions the alleged conduct of Boon-Sharpe, Donohue and Noriega; however, these Defendants and the claims asserted against them were dismissed when the court screened the amended complaint.

### 1. Exhaustion Standard

The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). An inmate must exhaust his administrative remedies irrespective of the forms of relief sought and offered through administrative avenues. *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The failure to exhaust administrative remedies is "'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007).

"If undisputed evidence viewed in the light most favorable to the prisoner shows a failure to exhaust, a defendant is entitled to summary judgment under Rule 56. If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts [in a preliminary proceeding]." *Id.*, 1168, 1170-71 (citations omitted).

Once a defendant shows that the plaintiff did not exhaust available administrative remedies, the burden shifts to the plaintiff "to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* at 1172 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n. 5 (9th Cir. 1996)); *Draper v. Rosario,* 836 F.3d 1072, 1080 (9th Cir. 2016) (inmate plaintiff did not meet his burden when he failed to identify any actions prison staff took that impeded his ability to exhaust his administrative remedies, or otherwise explain why he failed to comply with the administrative remedies process)). The ultimate burden of proof, however, remains with the defendant. *Id.*

**2. NDOC's Grievance Process**

NDOC's grievance process and the exhaustion of administrative remedies is governed by Administrative Regulation (AR) 740. (ECF No. 43-12.) Inmates may use the grievance procedure to resolve addressable inmate claims, such as claims involving personal property, property damage, disciplinary appeals, personal injuries, tort or civil rights claims. Inmates are expected to first try to informally resolve their issue with the applicable staff member, and if unsuccessful, must bring an informal level grievance. If the inmate is dissatisfied with the response at the informal level, he can appeal to the first level. Similarly, if dissatisfied with the response at the first level, the inmate must appeal to the second and final level. The failure to submit a proper grievance form within the applicable timeframes constitutes abandonment of the grievance.

It is considered an abuse of the inmate grievance procedure to file a grievance that contains more than one appropriate issue per grievance. An abuse of the grievance process results in the grievance being rejected. The inmate's failure to resubmit the grievance in the proper form and within the prescribed time frame constitutes abandonment of the grievance.

**3. Plaintiff's Grievance**

Plaintiff submitted an informal level grievance on March 27, 2017, stating that on March 21, 2017, he was in the infirmary and was told by Boon-Sharp to go to administrative segregation. He had legal documents to pack up and was refused to have a legal box earlier in the month. The legal documents were accidentally left in a laundry net bag. He asked the officer to call the infirmary to have Boon-Sharp hold his legal documents and was told she threw them in the trash can. He claims this was done on purpose when Boon-Sharp discovered a lawsuit against

her subordinates. Then, on the same day Hayman and Gomez never took him to the property room to obtain his personal property. In addition, he asserted that Esquivel and Sharp refused to provide him with eating utensils. He also asserted that he had to eat his meals with his hands and take toilet water to wash down his seizure medication because he did not have a cup and the sink in the cell was not working for 48 hours. He also claimed he was put in a cell without warmth. (ECF No. 50-1 at 72-76.)

The informal level grievance was returned because it contained more than one appropriate issue. Plaintiff was advised that he could correct the noted deficiency and resubmit his grievance at the same level. (ECF No. 50-1 at 71.)

Plaintiff filed a first level grievance stating that all of these incidents related to March 21, 2017. (ECF No. 50-1 at 78.) The grievance was returned because it contained more than one issue. Plaintiff was again advised he could correct the deficiency and re-submit the grievance at the same level. (ECF No. 50-1 at 79.)

Plaintiff submitted a second level grievance, again stating that he disagreed with the response, and asserted that the actions all took place on March 21, 2017. (ECF No. 50-1 at 80.) The grievance was also returned because it contained more than one appropriate issue. Plaintiff was advised that the failure to resubmit the grievance through the prescribed timeframe constitutes abandonment of the grievance. (ECF No. 50-1 at 77.)

**4. Argument**

Defendants assert that Plaintiff submitted an informal level grievance raising three issues, including the water issue, and it was rejected for grieving more than one issue. (ECF No. 43-13.) Plaintiff did not correct the deficiency, but submitted a first level grievance that was also rejected for grieving more than one issue. Again, Plaintiff did not correct and resubmit his grievance, but

1  filed a second level grievance, which was also rejected. Therefore, Defendants maintain that

2  Plaintiff did not properly exhaust his administrative remedies as to this claim.

3        Plaintiff claims that the issue of lack of a sink for 48 hours did proceed through the

4  grievance process. He also asserts that administrative remedies were unavailable to him and that

5  Defendants purposefully thwarted his efforts. He states that on March 21, 2017, Boon-Sharp,

6  Noriega, Esquivel, Donahue, sharp, Gomez and Hayman (which includes people who are not

7  defendants in this action), retaliated against him when they threw away legal documents and

8  failed to retrieve them; denied Plaintiff the opportunity to receive his personal property; and,

9  denied him a cell with a working toilet and running water. Plaintiff claims this was a continuous

10  incident, and so the grievance should not have been deemed improper. Plaintiff also claims that

11  the grievance was deemed improper by Byrne in retaliation for his grievance filings. (Pl. Decl.,

12  ECF No. 50 at 79-80.)

13        **5. Analysis**

14        Exhaustion cannot be satisfied by filing an untimely or otherwise procedurally infirm

15  grievance, but rather, the PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 89

16  (2006). "Proper exhaustion" refers to "using all steps the agency holds out, and doing so

17  *properly* (so that the agency addresses the issues on the merits)." *Id*. (emphasis in original)

18  (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). Thus, "[s]ection 1997e(a)

19  requires an inmate not only to pursue every available step of the prison grievance process but

20  also to adhere to the 'critical procedural rules' of that process." *Reyes v. Smith*, 810 F.3d 654,

21  657 (9th Cir. 2016) (quoting *Woodford,* 548 U.S. at 90). "[I]t is the prison's requirements, and

22  not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199,

23  218 (2007).

AR 740 clearly states that it is an abuse of the grievance process, and a grievance is properly rejected when it contains more than one appropriate issue. Plaintiff's grievance contained a multitude of issues, including the alleged destruction of his legal documents, the failure to give him his property, as well as the conditions of the cell he was eventually placed in. While Plaintiff claims that the issues he was complaining of on March 21, 2017, were all interconnected and all occurred that day, it is AR 740 and not Plaintiff's interpretation of his claims that determines whether Plaintiff has properly exhausted administrative remedies. Under AR 740, Plaintiff's grievance was properly rejected as containing more than one issue.

While Plaintiff claims the grievance should not have been rejected on this basis, he was advised three times that his grievance forms improperly contained multiple issues. He was advised at each level that he could correct the deficiency and re-submit his grievance, but he elected not to do so. Under these facts, it cannot be said that administrative remedies were unavailable to him because the regulation required him to separate out his issues in different grievance forms.

"[F]ear of retaliation may be sufficient to render the inmate grievance procedure unavailable[.]" *McBride v. Lopez*, 807 F.3d 982, 984 (9th Cir. 2015). "[T]he threat of retaliation for reporting an incident can render the prison grievance process effectively unavailable and thereby excuse a prisoner's failure to exhaust administrative remedies." *Id*. at 987. This requires a subjective and objective showing. *Id.* "To show that a threat rendered the prison grievance system unavailable, a prisoner must provide a basis for the court to find that he actually believed prison officials would retaliate against him if he filed a grievance." *Id*. at 987. "If the prisoner makes this showing, he must then demonstrate that his belief was objectively reasonable." *Id*. "That is, there must be some basis in the record for the district court to conclude

that a reasonable prisoner of ordinary firmness would have believed that the prison official's action communicated a threat not to use the prison's grievance procedure and that the threatened retaliation was of sufficient severity to deter a reasonable prisoner from filing a grievance." *Id*.

Other than generally stating that Byrne's rejection of the grievance for containing multiple issues was retaliatory, Plaintiff does not provide a specific, factual basis for the court to conclude that the rejection of the grievance was retaliatory, or that Plaintiff believed he would be retaliated against if he filed another grievance. Therefore, Plaintiff has not shown administrative remedies were unavailable to him on this basis.

In sum, Defendants have provided evidence that Plaintiff did not properly exhaust administrative remedies as to the lack of water for 48-hours claim in Count V. Plaintiff as not demonstrated that he did properly grieve the issue, or that administrative remedies were unavailable to him. Therefore, Defendants' motion should be granted as to Count V. While an unexhausted claim should usually be dismissed without prejudice, Plaintiff could not timely grieve this claim anew under AR 740; therefore, the dismissal should be with prejudice.

## **IV. RECOMMENDATION**

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **DISMISSING** Gomez, Healer and John Doe (as well as Count II asserted only against John Doe) **WITHOUT PREJUDICE**; and

(2) **GRANTING** Defendants' Motion for Summary Judgment (ECF No. 43) and entering judgment in the moving Defendants' favor.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: January 13, 2021

William G. Cobb
United States Magistrate Judge